UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARC A. BOWMAN,

*Plaintiff*

v.

DUTCHESS COMMUNITY COLLEGE,

*Defendant.*

23-cv-08482 (PH)

**PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56(a)(1) STATEMENT OF MATERIAL FACTS AND COUNTERSTATEMENT**

---

Plaintiff respectfully submits this response to defendants 'Statement of Undisputed Facts pursuant to Rule 56(a)(1) of the Local Civil Rules of the United States District Court for the Southern District of New York and his Counterstatement.

1. Plaintiff Marc Bowman filed a Summons and Complaint on September 27, 2023  (Exhibit A).

RESPONSE: **Admit**

2.  Defendant filed its answer on December 5, 2023 (Exhibit B).

RESPONSE: **Admit**

3.Defendant filed an amended answer on March 1, 2024 (Exhibit C).

RESPONSE: **Admit**

4. In his complaint, plaintiff alleged that defendant violated his rights guaranteed to him by the Equal Protection clause of the Fourteenth Amendment made

actionable by 42 USC section 1983 due to discrimination based on race, African American (Exhibit A).

RESPONSE: **Admit**

5. Plaintiff is African American (See Exhibit A).

RESPONSE: **Admit.**

6. DCC President Dr. Peter Jordan is African American (See Affidavit of Dr. Jordan, Exhibit D).

RESPONSE: **Admit.**

7. DCC President Dr. Peter Jordan knew plaintiff was African American when he agreed to hire plaintiff (See Affidavit of Dr. Jordan, Exhibit D).

RESPONSE: **Admit**

8. DCC President Dr. Peter Jordan knew plaintiff was African American when he decided not to renew plaintiff's contract with DCC (See Affidavit of Dr. Jordan, Exhibit D).

RESPONSE: **Admit**

9. Plaintiff testified that he interviewed for the Assistant Vice President for Human Resources position with Dr. Jordan (See Dep. of Plaintiff, Exhibit E, at 13).

RESPONSE: **Admit .**

10. Plaintiff testified that Dr. Jordan is "black" (Id. at 18).

RESPONSE: **Admit.**

11. Plaintiff testified that hiring decisions at DCC were made by the President (See id. at 22).

RESPONSE: **Admit.**

12. Plaintiff testified that Dr. Jordan made the decision to hire plaintiff and would decide whether the DCC contract with plaintiff would be renewed (See id. at 23-25).

RESPONSE: **Admit.**

13. By letter dated November 2, 2021, plaintiff was hired by DCC to the position of Associate Vice President of Human Resources Management at DCC (Exhibit F) with an annual salary of $130,000.

RESPONSE: **Admit.**

14. By letter dated December 15, 2021, Dr. Jordan apprised plaintiff of his appointment to the position of Associate Vice President of Human Resources Management at DCC (Exhibit G).

RESPONSE: **Admit.**

15. Plaintiff had an employment contract with DCC for a term of January 3, 2022 through August 31, 2022 (Exhibit H).

RESPONSE: Admit.

IMANAGE\7265\0246\45201556.v1-1/27/25

16. DCC renewed plaintiff's contract for a period of September 1, 2022, through August 31, 2023 with a salary of $135,000 (Exhibit I).

RESPONSE: **Admit.**

17. President Jordan decided the amount plaintiff would be paid under the renewal contract (See Dep. of P. Jordan, Exhibit J, at 40).

RESPONSE: **Admit.**

18. The employment contract for September 1, 2022, through August 31, 2023 contained a provision (2.B) entitled NON-RENWAL that stated either "the employee or DCC can terminate the employment relationship by providing written notice of the intention to non- renew this letter agreement no less than sixty (60) days prior to the end of any term.  Such notice shall be deemed given when physically delivered to the other party" (Exhibit I).

RESPONSE: **Admit.**

19. By letter dated June 29, 2023, plaintiff was supplied 60-day notification of DCC's decision not to renew plaintiff's employment with DCC (Exhibit I).

RESPONSE: **Admit.**

20. Plaintiff was supplied with a Performance Improvement Plan, dated March 22, 2023, from Adam Rathbun, Vice President of Finance and Administration (Exhibit K).

RESPONSE: **Admit.**

21. Adam Rathbun became Vice President of Finance and Administration in 2022 (See Dep. of P. Jordan, Exhibit J, at 18).

RESPONSE: **Admit that Adam Rathbun wasn't an employee of DCC when Mr. Bowman was hired. Bowman Dep. 42:4-9.**

22. Upon starting employment with DCC, Mr. Rathbun became plaintiff's direct supervisor and prior to that plaintiff's supervisor was President Dr. Jordan (See id. at 18, 19).

RESPONSE: **Admit but note that Mr. Bowman reported to both Adam Rathbun and Dr. Jordan. Bowman Dep. 42:14-23**

23. Dr. Jordan testified that during the summer of 2022 there were functions of the HR Department that were not being performed such as labor relations and employee relations including taking concerns of the employees and addressing them (See id. at 23-24).

RESPONSE: **Admit that he so testified but this statement was false. Bowman Declaration, para.** 3.

24. Dr. Jordan wanted plaintiff to develop a dashboard that would track open positions at DCC (See Id. at 27) and believed that when plaintiff made a presentation at an executive leadership meeting Dr. Jordan noted that the dashboard needed additional work (See id. at 52-53).

IMANAGE\7265\0246\45201556.v1-1/27/25

RESPONSE: **Admit but note that President Jordan agreed with plaintiff that creating the dashboard was a long-term project and there was no expectation that it would be completed by the executive leadership meeting referenced. Bowman Dep. 91:21-93:5, 94:5-23, Bowman Declaration at para. 4. Moreover, the completion of the dashboard was contingent on plaintiff's receiving information from the finance unit supervised by Rathbun. Bowman Dep. 94:13-95:8.**

25. Plaintiff presented the dashboard again at another meeting and Dr. Jordan believed that it still needed work (See id. at 53-55).

RESPONSE: **Admit and note that plaintiff required financial information to complete the dashboard. Bowman Dep. 63:10-64:16.**

26. Dr. Jordan testified that he was aware of a student complaint and faculty complaint about how plaintiff oversaw his Title IX responsibilities (See id. at 62, 72-73, 77-78).

RESPONSE: **Jordan never spoke with Bowman any such matter. Bowman Declaration at para. 5 and no such complaints were presented to plaintiff.**

27. Dr. Jordan spoke to plaintiff about being a more prominent voice during leadership meetings due to being reticent at those meetings (See id. at 91-92).

RESPONSE: **Admit, but this criticism was baseless as plaintiff participated in such meetings as avidly as others. Bowman Declaration, para. 6.**

IMANAGE\7265\0246\45201556.v1-1/27/25

28. Mr. Rathbun reviewed plaintiff's Performance Improvement Plan with Dr. Jordan before it was supplied to plaintiff as they both agreed that one was necessary (See id. at 46-47).

RESPONSE: **Admit.**

29. Dr. Jordan had conversations with Mr. Rathbun about plaintiff's performance and the possibility of separation from employment which it why the PIP was put into place (See id. at 111-112).

RESPONSE: **Deny that Rathbun ever broached with plaintiff the possibility of separation from DCC and this never happened in the context of the PIP. Bowman Declaration, para. 7.**

30. Dr. Jordan believed that plaintiff had lost credibility with Dr. Jordan, Mr. Rathbun and the DCC community (See id. at 130).

RESPONSE: **Deny. Neither Jordan nor Rathbun ever spoke with plaintiff in any manner which suggested this and instead they assigned him additional tasks during his second contract. Bowman Declaration, para. 8.**

31. On June 29, 2023, Mr. Rathbun met with plaintiff to inform him that DCC would not renew his contract (See id. at 117-118, 122).

RESPONSE: **Admit.**

32. Defendant relied upon the "nonrenewal" provision of plaintiff's employment contract when the decision was made not to continue plaintiff's employment with DCC (Id. at 133-134, 136).

RESPONSE: **Deny that this is material as that provision does not countenance racial discrimination in non-renewal and assures the opposite.**

33. Mr. Rathbun testified that he received a complaint about how plaintiff oversaw a Title XI investigation (See Dep. of A. Rathbun, Exhibit L, at 48).

RESPONSE: **Deny that Rathbun ever shared any information about this complaint with plaintiff or claims to have done so. Bowman Declaration, para. 9.**

34. Mr. Rathbun had concerns about plaintiff's level of training to oversee Title XI cases (See id. at 51-52).

RESPONSE: **Deny the materiality of this concern and deny that Rathbun ever shared this with plaintiff. Bowman Declaration, para. 8.  Before his hire, Mr. Bowman knew that he would be responsible for investigating Title IX complaints; after he was employed, he was assigned to serve as DCC's Chief Diversity Officer. 36:21-27:8. Plaintiff did not know about the latter responsibilities during the hiring process and found out about it after he was hired. 37:9-17. During his second contract at Dutchess Community College, Title IX regulations changed and Mr. Bowman took refresher course to**

familiarize himself with the new regulations. 39:4-11. He took the course during his second contract. 40:2-9. Plaintiff primarily oversaw the Title IX cases that involved investigations, hearings, and issuing decisions in a certain time period. 40:10-21. There was no backlog of such complaints/investigations during plaintiff's watch. As Chief Diversity Officer, Mr. Bowman developed a plan [in concert with a committee] that took couple of months to develop. Dr. Jordan reviewed and adopted it, then the committee and Mr. Bowman implemented the plan during his time at Dutchess Community College. 41:7-42:3.

35. Mr. Rathbun testified that he had had bi-weekly one-on-one meetings with plaintiff (See id. at 58).

RESPONSE: **Admit and this provided Rathbun with ample time to share any issues with the plaintiff. Bowman Declaration, para. 10.**

36. Mr. Rathbun testified that he would discuss with plaintiff the need to supply data for the dashboard at the Executive Leadership Team meeting (See id. at 60-61).

RESPONSE: **Deny; plaintiff never raised this with plaintiff though plaintiff's weekly reports show progress in the implementation of the dashboard. Bowman Declaration, para. 11 and Exhibit 1 for weekly reports between March 10 and May 2023. As Bowman explained at deposition, completion of**

IMANAGE\7265\0246\45201556.v1-1/27/25

the dashboard depended on Rathbun getting necessary information from the finance unit under his supervision. **Bowman Dep. at 63-64.**

37. Mr. Rathbun testified that he had conversations with HR staff about plaintiff's whereabouts during the workday and that while walking in the building he did not see plaintiff's car in the parking lot (See id. at 72, 108).

RESPONSE:  **Deny that before March 22, 2023 Rathbun had ever raised any such issue or question with Bowman or that Bowman ever violated any DCC rule or practice in this regard. Bowman Declaration, para. 12, Bowman Dep at 58, l. 16-59 l. 59, l. 18.**

38. Mr. Rathbun testified that he told plaintiff that he needed to be more aggressive at the Leadership meetings (See id. at 74).

RESPONSE: **Deny that Rathbun ever raised this issue with the plaintiff. Bowman Declaration, para. 13.**

39. Mr. Rathbun testified that he had issues with plaintiff's credibility and plaintiff would make statements in meetings that "didn't seem to line up with … reality…"  and information that came from HR was "either inconsistent or incorrect" (Id. at 75).

RESPONSE: **Plaintiff denies that Rathbun ever raised any such issue, either in this general form, or with regard to specific statements he made with him. Bowman Declaration, para. 14.**

IMANAGE\7265\0246\45201556.v1-1/27/25

40. Mr. Rathbun testified about speaking with plaintiff about the length of time it took for calculating back pay for a union contract that was ratified and that it took three or four months (See id. at 76-78).

RESPONSE: **Plaintiff denies that Rathbun ever raised any such issue with him or that this situation occurred. Bowman Declaration, para. 15.**

41. Mr. Rathbun testified about how during leadership meetings plaintiff did not supply his own opinions and basically agreed with others (See id. at 82, 86).

RESPONSE: **Deny; not only did Rathbun never raise any such issue until March 22, 2023, but the statement is categorically false. Bowman Declaration, para. 16, Bowman Dep. at 55, ll. 15-22.**

42. Mr. Rathbun testified about complaints he received from DCC employees about plaintiff being slow to respond and not supplying accurate data (See id. at 98-99).

REPSONSE:  Deny that this occurred or that Rathbun ever discussed this with him. **Bowman  Declaration, para. 17.**

43. Mr. Rathbun testified that he discussed with Dr. Jordan not renewing plaintiff's contract and it was agreed to employ the non-renewal provision in plaintiff's contract (See id. at 94-95).

RESPONSE: Admit that there was no cause to terminate plaintiff and none was ever discussed with him. **Bowman Declaration, para. 18.**

IMANAGE\7265\0246\45201556.v1-1/27/25

44. It was Dr. Jordan who made the final decision not to renew plaintiff's contract with DCC (See id. at 112-113; See Dep. of Plaintiff, Exhibit E, at 76).

RESPONSE: **Admit, but his decision was influenced by the feedback received from Rathbun, plaintiff's supervisor.**

45. After plaintiff was no longer employed by DCC, the director of payroll, Deborah Ramsey, was the interim Associate Vice-President of HR (See Dep. of A. Rathbun, Exhibit L, at 100). Deborah Ramsey is a white women (See id. at 100).

RESPONSE: **Admit.**

46. Corey Simms took over as Coordinator of Title IX, an African American women (See id. at 100; See Dep. of Plaintiff, Exhibit E, at 153-154).

RESPONSE: **Admit. Bowman Dep. 153:14-15.**

47. Melissa Carlo took over as interim diversity representative, who is Latina (See Dep. of Rathbun, Exhibit L at 101; See Affidavit of Dr. Jordan, Exhibit D; See Dep. of Plaintiff, Exhibit E, at 122, 154).

RESPONSE: **Admit.**

48. In January of 2024, a new AVP for HR was hired, Irene Okwang, who is an African American (See Dep. of Rathbun, Exhibit L, at 102; See Dep. of Plaintiff, Exhibit E, at 121, 152: Affidavit of Dr. Jordan, Exhibit D).

RESPONSE: **Admit and note that she did not oversee Title IX or serve as Chief Diversity Officer.** <mark>Bowman Dep. 121:15-20</mark>

49. Plaintiff admitted that he was "not sure" of the basis for his belief of discrimination (See Dep. of Plaintiff, Exhibit E, at 144).

RESPONSE: **Deny; Mr. Bowman wasn't sure which impermissible consideration caused the adverse action.** <mark>Bowman Dep. 144:6-17.</mark>

## PLAINTIFF'S COUNTERSTATEMENT OF FACTS

1. Plaintiff Marc Bowman is an African American adult who is a citizen of the United States and resides within this judicial district. Admitted

   **RESPONSE**: Admit

2. Defendant Dutchess Community College is an employer created by the State of New York and supported by public funds.  It is a state actor and may sue and be sued for violations of the Fourteenth Amendment. Admitted.

   **RESPONSE**:  Admit that Dutchess Community College is an employer created by the State of New York and supported by public funds and otherwise object as questions of law are not appropriate for a Rule 56(a)(1) Statement of Undisputed Facts (See Amened Answer, Exhibit C).

13

3. As plaintiff alleges that defendant violated rights guaranteed to him by the equal protection clause of the Fourteenth Amendment, this court has jurisdiction over this matter pursuant to 28 U.S.C. secs. 1331, 1343 (a) (3 & (4) and 42 U.S.C. secs. 1981 and 1988. Admitted.

   **RESPONSE:** Admit that is what plaintiff alleges in his complaint but otherwise deny as there is no merit to the allegations (See Exhibit C).

4. By letter dated November 2, 2021, contingent on her receipt of "strong recommendations" from his references, successful criminal background and educational checks and the final approval by DCC's Board of Trustees, Ruth E. Spencer, Interim Director of Human Resources, offered plaintiff the position of Associate Vice President of Human Resources with an annual salary of $130,000 and benefits. Exhibit 1 to Sussman Affirmation.

   **RESPONSE**: Admit as to what the November 2, 2021 letter states but otherwise deny as the above paragraph does not also indicate that acceptance of the employment and salary offer must be in writing with the conditions expressed in the November 2, 2021 letter. Also, the letter indicates that the offer was made with "President Jordan's approval."

5. On December 15, 2001, President Jordan advised plaintiff that the Board of Trustees had "officially approved your appointment" to this position. Exhibit 2 to Sussman Affirmation.

   **RESPONSE:** Admit to the contents of the refenced letter from President Jordan but add the letter was dated December 15, 2001.

6. On December 28, 2021, plaintiff signed an Employment Contract with defendant which, *inter alia*, promised him "meaningful and effective supervision" and "fair and equitable treatment including due process and statutory compliance." Exhibit 3 to Sussman Affirmation.

   **RESPONSE:** Admit.

7. During his first year of employment, defendant expanded plaintiff's job duties and, in addition to his responsibilities as Associate Vice President of Human Resources, assigned him to serve as its Title IX Officer and the Chief Diversity Officer, two distinct and separate positions with their own position descriptions. Bowman Declaration, para. 19.

   **RESPONSE**: Deny as the above is not accurate.  The Title IX duties were set forth in the job description as part of the position (See Exhibit M; See also Dep. of. P. Jordan, Exhibit J, at 62-63).  As for Chief Diversity Officer that same job description allowed President Jordan the right to assign plaintiff responsibilities (Exhibit M).  Plaintiff was

IMANAGE\7265\0246\45201556.v1-1/27/25

charged with coordinating the Diversity Council (See Dep. of P. Jordan, at 63).

8.  On September 10, 2015, the SUNY Board of Trustees adopted Diversity, Equity, and Inclusion Policy, Document No. 7809 which created a first-in-the-nation infrastructure for supporting diversity, equity, and inclusion by requiring that each of SUNY's colleges and universities, and SUNY System Administration have a Chief Diversity Officer (CDO). Exhibit 4 to Sussman Affirmation.

    **REPSONSE**:  Admit that Document No. 7809 exists, that it is entitled Diversity, Equity, and Inclusion Policy, was adopted on September 10, 2015 and that the policy speaks for itself and otherwise deny as plaintiff presents no quoted language to support its rendition of that policy.

9.  Specifically, regarding the campus CDO, the policy states that the campus CDO will: • Be a senior member of the campus administration, reporting directly to the president or provost; • Work collaboratively with offices across campus—including but not limited to, the offices of academic affairs, human resources, enrollment management, and admissions; • Elevate inclusiveness and implement best practices related to diversity, equity, and inclusion in such areas as the recruitment and retention of students and senior administrators, faculty, and staff hires;

and • Serve as part of a Systemwide network of CDOs to support SUNY's overall diversity goals. Id.

**RESPONSE**:  The policy speaks for itself as attached to plaintiff's declaration but defendant objects as plaintiff does not fully quote the entirety of what is stated in the policy.

10. Plaintiff understood that the position of CDO was important and was supposed to be independent of the HR Office which he was assigned to manage. Bowman Declaration, para. 20.

**RESPONSE**:  Admit that plaintiff was hired to manage the HR Office and otherwise deny as plaintiff presents no legal authority to support his position of the CDO having to be independent of the HR Office.

11. On several occasions, plaintiff advised defendant's president and Adam Rathbun, his immediate supervisor and defendant's Vice President for Finance and Administration, that he had been assigned three full-time jobs without adequate staffing support and needed assistance. Bowman Declaration, para. 21, Bowman Dep. at 43, ll. 10-13. .

**RESPONSE**:  Admit that Adam Rathbun was plaintiff's immediate supervisor and defendant's Vice President for Finance and Administration, and otherwise deny as what plaintiff complains about falls within his job description (Exhibit M).

12. In response, Defendant's President advised plaintiff to do his best. Id,

    **RESPONSE**:  Admit only that is what plaintiff may attest to however as of the date of this response no testimony of that exists in plaintiff's deposition transcript and no declaration has been supplied from plaintiff.

13. In October 2022, Defendant provided plaintiff with a second annual contract retroactive to September 1, 2022, at the annual salary of $135,000 plus benefits. Exhibit 5 to Sussman Affirmation.

    **RESPONSE**:  Admit

14. This contract allowed the employer to immediately terminate plaintiff for cause for "any action…which has a material detrimental effect on DCC's operation, reputation or business" and for the "failure or inability to perform any assigned duties after written notice from DCC and a reasonable opportunity to cure." Id. See section 2, para. A (iii) and )v).

    **RESPONSE**: Admit as the contract speaks for itself but add that the contract also contained a non-renewal provision (See paragraph 18, supra).

15. On March 22, 2023, Rathbun provided plaintiff with a memorandum justifying implementation of a Performance Improvement Plan [PIP] and directed that plaintiff sign it. Exhibit 6 to Sussman Affirmation, Bowman Dep. at 46, l. 15-47, l. 19.

18

**RESPONSE:**  Admit to the above except deny that plaintiff was "directed" to sign it as plaintiff testified that he was "encouraged to sign by Adam Rathbun" not that he as directed to (See Dep. of Plaintiff at page 47 lines 2-47).

16. That memorandum contains no mention of any problem with the "dashboard" project, any Title IX complaint that plaintiff failed to properly investigate, plaintiff's allegedly improper absences from the office or any complaint that plaintiff or his staff did not timely calculate sums due to employees under a new union contract. *Id.*

**RESPONSE:**  Deny. The PIP contains a provision about "Availability" due to staff being unaware of plaintiff's location, lack of follow through on reports from leadership or matters critical to the College. The production of the dashboard is listed as being part of an improvement goal (Exhibit K).  Title IX is listed as a need for professional development (See id.).

17. Before providing plaintiff the PIP, neither Jordan nor Rathbun had provided plaintiff with any complaint about his performance. Bowman Dep. at 48, ll. 15-23, 137, ll. 3-14, 140, ll. 7-10.

**RESPONSE:**  Deny.  President Jordan had one on one meetings with plaintiff to discuss feedback on such topics as the dashboard to deal with

improving recruitment, discussion about directions and priorities (See Dep. of P. Jordan, Exhibit J, at 26-28). There was also a meeting with plaintiff, Dr. Jordan and Rathbun to discuss various tasks that plaintiff needed to complete (See id.). Feedback was supplied. In fact, Rathbun testified about conversations he had with plaintiff prior to issuing the PIP plan (See pages 73-75).

18. Rathbun told plaintiff that he did not write the March 22, 2023, memorandum but did not indicate who did. Id. at 71, ll. 9-14.

    **RESPONSE**: Admit that is what plaintiff testified to but deny as Rathbun admits he write the Performance Improvement Plan and showed it to Dr. Jordan before being presented to plaintiff (Dep. of Rathbun, Exhibit L, pages 69-73).

19. At the time he received the PIP, plaintiff did not owe any reports to anyone at DCC. Id. at 49, ll. 5-11. 50, 1, 19-51, l. 8.

    **RESPONSE:** Admit that is what plaintiff testified to but otherwise deny, as the dashboard was never fully completed, which was part of plaintiff's job duties (See Dep. of Rathbun, Exhibit L, at 75-76; Dep. of P. Jordan, Exhibit J, at 53-55). Dr. Jordan testified that as of March 22, 2023, plaintiff promised certain reports pertaining to the dashboard and reports on organization of HR that were not delivered (See Exhibit J, at 88).

20. The memorandum dated March 22, 2023 includes the claim that plaintiff needed to improve his communication. Exhibit 6 to Sussman Affirmation.

   **RESPONSE:** Admit

21. Plaintiff asked Rathbun what this was about. Bowman Dep. at 52, ll. 8-22.

   **RESPONSE:** Admit that is what plaintiff testified to.

22. Rathbun told him that he thought plaintiff was doing a good job and was himself "a little surprised where the information might have come from but he would support [me]." Id. ll. 17-22.

   **RESPONSE:** Admit only that is what plaintiff testified to but otherwise deny as Rathbun was the one that informed Dr. Jordan that plaintiff did not show improvement and recommended that the contract with plaintiff not be renewed (See Dep. of Rathbun, Exhibit L, at 93-95). Rathbun supplied the PIP to Dr. Jordan before it was issued to plaintiff and explained during his deposition where the information used in the PIP derived from (See id. at 69-73).

23. On March 23, 2023, Rathbun did not advise plaintiff that any reports he was supposed to file were missing. Id. at 62, ll. 9-14.

   **RESPONSE:** Admit only that is what plaintiff testified to but otherwise deny as plaintiff was well aware of his obligation to complete that

dashboard, which was never fully completed (See Dep. of Rathbun, Exhibit L, at 75-76; Dep. of P. Jordan, Exhibit J, at 53-55) and complete reports on organization of HR that were not delivered (See Exhibit J, at 88).

24. Before March 22, 2023, plaintiff had developed the dashboard he could complete to Rathbun. Id. at 62, l. 18-63, l. 9.

    **RESPONSE:** Deny. The dashboard was never properly and fully completed (See Dep. of Rathbun, Exhibit L, at 75-76; Dep. of P. Jordan, Exhibit J, at 53-55).

25. Plaintiff explained that the two men knew there were other components of the dashboard "that we didn't have from one of the other departments." Id. at 63, ll. 1-19.

    **RESPONSE:** Admit only that is what plaintiff testified to but otherwise deny as contrary to plaintiff's excuse he failed to perform his job as the dashboard was never properly and fully completed and plaintiff could have taken initiative to obtain any information he needed as suggested by Dr. Jordan by working with the Institutional Research Department (See Dep. of Rathbun, Exhibit L, at 75-76; Dep. of P. Jordan, Exhibit J, at 53-55, page 54 lines 10-15]).

26. Specifically, they needed all of the budgeted open positions from Finance, a unit Rathbun himself supervised. Id. at 63, ll. 20-64, l. 16.

    **RESPONSE:** Admit only that is what plaintiff testified but otherwise deny at there was a way to pull the data by using DCC's system that plaintiff had access to (See Dep. of Rathbun, Exhibit L, pages 36-38).

27. From March 10, 2023, through May 5, 2023, at his initiative, plaintiff completed and submitted weekly status reports to Rathbun. Exhibit 6 to Sussman Affirmation is a compilation of those reports, Bowman Dep at 44, l. 3-45, l. 11.

    **RESPONSE**: Admit that is what plaintiff testified to and status reports have been produced in discovery.

28. Rathbun convened one meeting with plaintiff to discuss the latter's progress under the PIP. Id. at 71, l. 18-72, l. 10.

    **RESPONSE:** Admit that is what plaintiff testified to but otherwise deny as Rathbun testified that after the PIP was issued he still continued to have bi-weekly meetings with plaintiff (See Dep. of Rathbun, Exhibit L, at 67 lines 11-18).

29. At this meeting, Rathbun told plaintiff he "was doing great." Id. at 72, ll. 11-13.

**RESPONSE:**  Admit only that is what plaintiff testified to but otherwise deny as plaintiff's performance was not satisfactory as it did not improve subsequent to the implementation of the PIP (See Dep. of Rathbun, Exhibit L, at 93-95).

30. As his direct supervisor, Rathbun rarely acknowledged receipt of plaintiff's weekly status reports, Bowman Dep. at 45, ll. 8016, and never provided any written feedback to plaintiff concerning the content of these weekly status reports.  Bowman Declaration, para. 22.

    **RESPONSE:**  Admit only that is what plaintiff testified to but otherwise deny as Rathbun testified that he would read the weekly status reports (See Dep. of Rathbun, Exhibit L, at 68 [line 21-24]-69 [line 1-2]).

31. Instead, he told Bowman that "he didn't get a chance to look at" the reports. Bowman Dep. at 46, ll. 2-6.

    **RESPONSE:** Admit only that is what plaintiff testified to but otherwise deny as Rathbun testified that he would read the weekly status reports (See Dep. of Rathbun, Exhibit L, at 68 [line 21-24]-69 [line 1-2]).

32. Rathbun's calendars show that between March 10 through May 10, 2023, he met with plaintiff one-on-one on March 15, March 22, March 29, April 12, and May 10. Exhibit 7 are the entries from the calendars defendant produced during discovery confirming these meetings.

RESPONSE:  Admit that the documents produced speak for themselves.

33. In the fall of 2022, defendant commissioned a report from a consulting company concerning the staffing of its Human Resources function which recommended the division of the roles plaintiff has been solely assigned as explained above. Exhibit 8 to Sussman Affirmation.

RESPONSE: Admit that defendant retained the services of Evergreen Solutions, LLC, and its report issued speaks for itself but otherwise deny as Evergreen was retained not just to study the staffing of the Human Resources Department as it was also commissioned to evaluate the services offered and HR's overall efficiency and effectiveness, which the report explains was not sufficient (See Exhibit 8 to Sussman Affirmation).

34. Despite this report's conclusions, during the ensuing 10 weeks, defendant did not reduce the over-work which its President assigned plaintiff. Bowman Declaration, para. 22, Bowman Dep. at 141, l. 3-142, l.18.

RESPONSE:  Admit only that is what plaintiff testified to.

35. Instead, on June 29, 2023, advising him that he was not a proper "cultural fit," Rathbun advised him that defendant had decided to terminate his employment. Bowman Dep. at 76, Exhibit 9 to Sussman Affirmation.

**RESPONSE**: Deny.  Plaintiff was not terminated, his contract was not renewed as defendants' right due to the non-renewal clause of the employment contract (See Dep. of P. Jordan, Exhibit J, at 133-134, 136; Contract, Exhibit I).  Admit only that plaintiff testified about use of "cultural fit" but deny as to it having any substance or being material since according to plaintiff there was no indication from Rathbun as to what was meant by it (Dep. of Plaintiff, pages 76 [line 23] 77 [lines 2-4].

36. Plaintiff's supervisor also advised him that his position would be divided into three and that the defendant intended to hire three replacements for him.  Bowman Declaration, para. 23

    **RESPONSE:** Deny.  As of the date of preparing this response, no such Bowman Declaration has been supplied to defendant.

37. After terminating plaintiff, defendant has divided plaintiff's three distinct roles as between three Caucasians, including Rathbun, Dr. Carlo and Deborah Ramsey. Bowman Declaration, para. 24.

**RESPONSE:**   Deny.  Plaintiff was not terminated, his contract was not renewed as defendants' right due to the non-renewal clause of the employment contract (See Dep. of P. Jordan, Exhibit J, at 133-134, 136; Contract, Exhibit I).  Deny as after plaintiff was no longer employed by DCC, the director of payroll, Deborah Ramsey, was the interim Associate Vice-President of HR

IMANAGE\7265\0246\45201556.v1-1/27/25

(See Dep. of A. Rathbun, Exhibit L, at 100). Deborah Ramsey is a white women (See id. at 100). Corey Simms took over as Coordinator of Title IX, an African American women (See id. at 100; See Dep. of Plaintiff, Exhibit E, at 153-154). Melissa Carlo took over as interim diversity representative, who is Latina (See Dep. of Rathbun, Exhibit L at 101; See Affidavit of Dr. Jordan, Exhibit D; See Dep. of Plaintiff, Exhibit E, at 122, 154). In January of 2024, a new AVP for HR was hired, Irene Okwang, who is an African American (See Dep. of Rathbun, Exhibit L, at 102; See Dep. of Plaintiff, Exhibit E, at 121, 152: Affidavit of Dr. Jordan, Exhibit D).

38. Despite his substantial over-extension, the plaintiff performed the duties and responsibilities assigned to him. Bowman Declaration, para. 24.

   **RESPONSE:** Deny. The record shows that plaintiff did not adequately perform his duties and responsibilities (See Dep. of Rathbun, Exhibit L, at 75-76, 113-114; Dep. of P. Jordan, Exhibit J, at 53-55, 88, 129-130, 133-134; Performance Improvement Plan, Exhibit K; Evergreen Solutions Report, Exhibit 8 to Sussman Affirmation).

39. Plaintiff replaced a Caucasian who was not required or expected to perform the duties and responsibilities associated with three distinct positions. Bowman Declaration, para. 25.

**RESPONSE**: Deny.  No testimony from the person that plaintiff replaced exists to confirm what is stated in paragraph 39 above so it is unsubstantiated.

40.  Plaintiff's Caucasian predecessor kept her files in a haphazard manner and continued in her position for more than a decade. Id.

**RESPONSE**: Deny.  No testimony from the person that plaintiff replaced exists to confirm what is stated in paragraph 40 above so it is unsubstantiated.

41.  Plaintiff assiduously performed the job functions associated with him, but, unlike Caucasian Vice Presidents who did receive stipends for additional assignments, he did not. Bowman Declaration, para. 26.

**RESPONSE:** Deny.  The record shows that plaintiff did not "assiduously" perform his duties and responsibilities (See Dep. of Rathbun, Exhibit L, at 75-76, 113-114; Dep. of P. Jordan, Exhibit J, at 53-55, 88, 129-130, 133-134; Performance Improvement Plan, Exhibit K; Evergreen Solutions Report, Exhibit 8 to Sussman Affirmation).  Admit that plaintiff did not receive a stipend but deny as he received a 4% pay increase due Dr. Jordan assigning plaintiff to be the Chief Diversity Officer (See Dep. of P. Jordan, Exhibit J, at 38-41).  The salary increase was $5,200 (See id. at 38, 40).

42.  For the purpose of such personnel decisions, the college has delegated final authority to its President who, according to Rathbun, made the termination decision challenged herein. Bowman Declaration, para. 27, Bowman Dep. at 76, ll. 7-15.

**RESPONSE:** Admit that final personnel decision making rests with Dr. Jordan and otherwise deny as plaintiff was not terminated. Dr. Jordan exercised defendant's right under the contract, pursuant to the non-renewal clause of the employment contract, to not extend plaintiff's employment contract (See Dep. of P. Jordan, Exhibit J, at 133-134, 136; Contract, Exhibit I).

43.  In explaining plaintiff's termination, Rathbun told plaintiff he "was not a culture fit." Id. at ll. 21-22.

**RESPONSE:** Admit only that plaintiff testified about use of "cultural fit" but deny as to it having any substance or being material since according to plaintiff there was no indication from Rathbun as to what was meant by it (Dep. of Plaintiff, pages 76 [line 23] 77 [lines 2-4).

44.  When plaintiff asked what Rathbun meant by this comment, he received no response. Id. at 76, l. 23-77, l. 4.

**RESPONSE:** Admit only that plaintiff testified about use of "cultural fit" but deny as to it having any substance or being material since according to plaintiff there was no indication from Rathbun as to what was meant by it (Dep. of Plaintiff, pages 76 [line 23] 77 [lines 2-4).

45.  During the termination meeting, Rathbun stated that he felt bad about the decision and that he knew what it was like to feel like you have a target on your back or to be targeted. Id. at 77, ll. 7-19.

**RESPONSE:**  Admit only that is what plaintiff testified to but otherwise deny as explained above, plaintiff was not terminated.

46.  Without explanation, Jordan refused to speak with plaintiff about the PIP. Id. at 101, ll. 9-18,

**RESPONSE:** Admit only that is what plaintiff testified to but deny as Dr. Jordan did speak to plaintiff after the PIP was issued (See Dep. of P. Jordan, Exhibit J, at 120).

47.  After hiring plaintiff, Jordan told him that he would serve as chief diversity officer. Id. at 103, l. 20-104, l. 13.

**RESPONSE**: Admit

48.  Plaintiff had a 35-hour work week, but typically worked 60 hours a week, handling three separate jobs. Id. at 103, l. 20-105, l. 22, 107, l. 14-  108, l. 19.

**RESPONSE:** Deny.  There is no proof that plaintiff actually worked 60 hours a week especially since there were periods of time where no one knew where has was during the work day.  Nothing in the job description indicates that the job involved a 35-hour work week  (Exhibit M) and the responsibilities were all part of one job since Title IX was included in the job description as well as being assigned additional responsibilities by the President.  Plaintiff was supplied a 4% pay increase for his work as Chief Diversity Officer (See Dep. of P. Jordan, Exhibit J, at 38-41).

49. Plaintiff's successor as Associate Vice President for HR is doing one of the three functions he was assigned. Id. at 121, ll. 13-20, 140, l. 14-141, l. 2.

   **RESPONSE**: Deny.   There is no evidence of this in the record.  Plaintiff is no longer employed with defendant, he has no direct knowledge of what his successor does on a day to day basis.

50. At deposition, when asked why he felt his treatment had anything to do with his race, plaintiff responded, "I felt that I was treated different than other people who have been in this position prior and as well as people who were in the cabinet." Id. at 79, ll. 10-16.

   **RESPONSE:** Admit only that is what plaintiff testified to but deny as when asked during his deposition plaintiff admitted that he was "not sure" of the

basis for his belief of discrimination (See Dep. of Plaintiff, Exhibit E, at 144).

51. Two white women who also served as Associate Vice Presidents were provided stipends when given additional duties while plaintiff was not. Id. at 54, ll. 15-19 & 80, ll. 6-15.

**RESPONSE:** Admit that plaintiff testified that others received stipends but otherwise deny as his responsibilities included Title IX coordinator as indicated in the job description as well as being assigned additional responsibilities by the President (Exhibit M). Plaintiff was adequately compensated since he was supplied a 4% pay increase for his work as Chief Diversity Officer (See Dep. of P. Jordan, Exhibit J, at 38-41).

52. Plaintiff also noted the incongruity of getting a performance based 4% raise in October 2022 and being terminated eight months later. Id. at 82, ll. 12-22.

**RESPONSE:** Admit that plaintiff obtained a 4% raise and otherwise deny. As explained above, plaintiff was never terminated. Defendant decided not to renew the contract as is its right when the contract expired.

53. During his second contract, plaintiff requested a stipend from Jordan. Id. at 83, ll. 2022.

**RESPONSE:** Admit

54. Jordan told plaintiff to write a proposal but then rejected his it, claiming that

his additional work could be done within the work week, and that if plaintiff

needed additional support, the college would bring someone to help. Id. at 84.

**RESPONSE:** Admit only that is what plaintiff testified to.

55. When plaintiff sought to hire additional help, he was not allowed to hire

anyone. Id.

**RESPONSE:** Admit that is what plaintiff testified to but add plaintiff

testified that he was informed that hiring an additional employee was not in

the budget (See Dep. of Plaintiff, at 84).

56. Plaintiff has a master's degree in business administration and human

resources which he earned in 2003. Id. at 6, ll. 6-12.

**RESPONSE**:  Admit that is what plaintiff testified to.

57. Plaintiff was in his mid-fifties when he worked for defendant and he had a

long history of employment doing HR. Id. at 5, l. 23-6, l. 2; at 7, l. 2-10, l. 7.

**RESPONSE:** Admit that is what plaintiff testified to.

58.  As HR Director at DCC, plaintiff had six people reporting to him. Id. at

15, ll. 2-5.

**RESPONSE**:  Admit that is what plaintiff testified to.

59. Plaintiff's "interim" predecessor, Ruth Spencer, explained to him that there

were insufficient staff to perform the functions expected of the department.

Id. at 20, l. 20-21, l. 7.

**RESPONSE:**  Defendant objects as plaintiff's testimony relies on inadmissible hearsay.  Plaintiff is not testifying about his personal knowledge but that of someone else. Thus, the entire paragraph should be not be considered by the Court.

60. Specifically, the college had about 40 vacancies when plaintiff came on board and was behind in hiring. Id. 21, ll. 10-22.

**RESPONSE**:  Admit that is what plaintiff testified to but otherwise deny since plaintiff never completed the dashboard so there is no documentation to substantiate as such.


Respectfully submitted,

Michael H. Sussman [3497]

SUSSMAN & ASSOCIATES
Counsel for Plaintiff Bowman
PO BOX 1005
GOSHEN, NY 10924]
(845)-294-3991
Sussman1@sussman.law

IMANAGE\7265\0246\45201556.v1-1/27/25